```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
DAVID TOWNSLEY,                                              :
                                                             :
                              Plaintiffs,                    :
                                                             :
                -v-                                          :
                                                             :
AIRXCEL, INC.,                                               :
                                                             :
                              Defendant.                     :
                                                             :
------------------------------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 15, 2018

18-cv-1439 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On September 1, 2016, Airxcel, Inc., the defendant herein, purchased Townsley Industries, Inc. (d/b/a MCD Innovations ("MCD")). The Stock Purchase Agreement ("SPA") was executed by MCD's President, founder and plaintiff herein, David Townsley. The SPA provided for an immediate payment of $16 million and a potential maximum future payment (the "Earn-Out Payment") of up to $5.6 million based on achieving Adjusted EBITDA targets. At the close of the earn-out period, MCD had failed to reach a target requiring any Earn-Out Payment. This litigation followed.

On February 16, 2018, Townsley commenced this action, asserting several claims. Two amendments to the initial complaint followed. The Second Amended Complaint ('SAC"), filed on April 18, 2018, is the operative pleading. It asserts claims for fraudulent inducement (Count I), breach of contract (Count II), and violation of the Texas Securities Act (Count III). On May 9, 2018, defendant moved

to dismiss the SAC in its entirety.  Because defendant appended certain documents extraneous to its motion, on May 18, 2018, the Court converted the motion to one for summary judgment and provided each side an opportunity to submit additional arguments or materials.  Accordingly, the Court reviews the pending motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The resolution of plaintiff's fraudulent inducement claim is straightforward: it is precluded by the four corners of the SPA, including a Non-Reliance agreement in section 4.31 and a merger integration clause in section 8.5.  Plaintiff's Texas Securities Act claim is likewise precluded by a New York choice of law clause in section 8.6 of the SPA.  Defendant's motion is therefore GRANTED as to these claims.

The analysis of plaintiff's breach of contract claim, however, is more complex.  The core assertion is that defendant breached its contractual obligations under the SPA by failing to take actions, or taking actions, that resulted in MCD missing the Adjusted EBITDA targets that would have triggered an Earn-Out Payment.  After carefully considering plaintiff's allegations, the Court holds that plaintiff's claim as to subparagraphs (d)(i)-(ii) of section 1.5 must be dismissed because plaintiff's assertions do not fall within the very narrow set of actions that those subparagraphs prohibit.  Defendant's motion is therefore GRANTED as to the portion of plaintiff's breach of contract claim concerning those provisions.

However, the Court concludes that there is a triable issue of fact as to whether defendant acted with the intent and effect of avoiding or reducing the

Earn-Out payment in violation of subparagraph (d)(iii) of section 1.5. And as a result, plaintiff's additional claim for breach of the SPA's indemnification provision in subsection 7.2(b), which requires indemnification for any loss resulting from a breach of the SPA, must also go forward. Thus, defendant's motion is DENIED as to plaintiff's claim for breach of SPA subparagraph (d)(iii) of section 1.5 and subsection 7.2(b).

I. FACTS PERTINENT TO THE MOTION[1]

In opposition to this motion, plaintiff recites a number of facts drawn from the SAC regarding the history of negotiations between the parties. These facts are frankly irrelevant to the resolution of this motion. Instead, the Court focuses on the pertinent facts.

Airxcel is in the business of providing services and products to companies in the recreational vehicle ('RV") industry. It owns and operates several subsidiaries, including MCD. MCD specializes in manufacturing and selling window shades to dealers, retailers and original equipment manufacturers in the RV industry.

In 2016, Airxcel began negotiations with MCD; these negotiations eventually led to the SPA, dated as of September 1, 2016. During the negotiations, one point of disagreement concerned the purchase price: MCD sought $20 million, and Airxcel wanted to pay four million less, or $16 million. The Earn-Out Payment was agreed upon as a way of closing this gap. As set forth in the language of the provision quoted below, on the one hand Airxcel agreed to make an additional payment of up

---

[1] The following facts are undisputed unless otherwise noted.

3

to $5.6 million to Townsley only if certain Adjusted EBITDA targets were met, on the other hand, Townsley explicitly conceded that no payment was guaranteed. Notably, the SPA did not contain any commitments or agreements of any kind by Airxcel to operate the MCD in any particular manner, including with regard to the number or identity of sales personnel.

One month following its acquisition of MCD, Airxcel announced a second acquisition – this time of a company called "Dicor" along with is affiliates, including one that competed directly with MCD, "United Shade." No provision of the SPA prohibited such a transaction and indeed, certain provisions (including Annex 2 and subsection 1.5(d)) anticipate that one is possible.

Following the closing, Airxcel took over the operations of MCD. Over the course of 2016, MCD's revenues were lower than what Airxcel had anticipated or plaintiff Townsley hoped. As of year-end 2017, MCD had failed to achieve the Adjusted EBITDA targets to trigger any Earn-Out Payment.

Section 1.5 of the SPA sets forth the terms of the Earn-Out Payment. Notably, in subparagraph (d), Airxcel (the "Purchaser") agreed:

> [not to] (i) take any action, or cause any action to be taken, the purpose of which is to shift any Company-related revenues or expenses to or from an Affiliate of the Company…(ii) allocate any corporate overhead expenses of Purchaser or any Affiliate of Purchaser to the Company…(iii) take any actions in bad faith, in the case of clauses (i), (ii) and (iii) with the intent and effect of avoiding or reducing the Earn-Out Payment, if any,

4

> hereunder by such actions. David Townsley acknowledges that there is no guarantee that he shall receive any Earn-Out Payment hereunder…

(ECF No. 47-1, § 1.5(d).)

The Selling Shareholders, which included Townsley, provided a series of representations and warranties to defendant Airxcel. Among them are the following:

> 4.31 <u>Non-Reliance</u>. The Selling Shareholders (a) have not relied upon the accuracy or completeness of any express or implied representation, statement or information of any nature made or provided by or on behalf of Purchaser, except for the representations and warranties of Purchaser expressly set forth in <u>Article V</u>, and (b) waives any right the Selling Shareholders may have against any Purchaser Indemnified Party [which includes the defendant Airxcel] with respect to any inaccuracy in any such representation, statement or information or with respect to any omission…of any potentially material information; provided, that this Section 4.31 shall not apply to any claims for fraud or intentional breach or any rights of the Selling Shareholder Indemnified Parties pursuant to <u>Article VII</u>.

(<u>Id.</u>, § 4.31.)

The SPA also contains a standard merger integration clause:

> 8.5 <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the Disclosure Schedules Exhibits and Annexes hereto) and the other Selling Shareholder Documents, Company Documents and Purchaser Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and can be

> amended, supplemented or changed, and any provision can be waived, only by written instrument…

(Id., § 8.5.) Section 8.6 contains a New York choice of law provision. Subparagraph 9.3(a)(viii) provides that the parties have "participated jointly in the negotiation and drafting of the [SPA]."

II.     PLAINTIFF'S CLAIMS

According to plaintiff, prior to plaintiff Townsley's execution of the SPA, Airxcel made numerous promises regarding how it would operate the business that it failed to keep. For example, plaintiff asserts that he was told that Airxcel intended to hire a new full-time salesperson and would devote its salesforce to selling MCD's products, that it would supply engineering assistance to enable MCD to launch new products, that it would allow MCD to take advantage of is freight and shipping network, and that it would expand MCD's product lines and commercial and distributor markets. The bulk of the factual allegations in the SAC are directed at the communications in which Airxcel made these purported promises. Plaintiff asserts that at no time was he told that Airxcel intended to acquire Dicor, a competitor of MCD. The remaining allegations concern plaintiff Townsley's numerous communications with Airxcel following the closing of the stock purchase transaction, complaining that MCD was not being operated in a manner that would

maximize the opportunity for MCD to meet the targets triggering the Earn-Out Payment.

III.   LEGAL PRINCIPLES

   A.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23.

In making a determination on summary judgment, a court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise

exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations omitted).

B. Breach of Contract

To succeed on a claim for breach of contract, a plaintiff must demonstrate "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)). "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000).

Under New York law, "when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract." In re Matco-Norca, Inc., 22 A.D.3d 495, 496 (N.Y App. Div. 2005) (citations omitted). "Further, a court may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning." Id. (citations omitted).

C. Fraudulent Inducement

A claim of fraudulent inducement under New York law requires plaintiffs to allege: "'(1) that the defendant made a representation, (2) as to a material fact, (3)

8

which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury.'" Eaves v. Designs for Fin., Inc., 785 F. Supp. 2d 229, 246 (S.D.N.Y. 2011) (quoting Computerized Radiological Servs. v. Syntex Corp., 786 F.2d 72, 76 (2d Cir. 1986)). A plaintiff asserting fraudulent inducement must also satisfy the "heightened pleading standards of Federal Rule of Civil Procedure 9(b), which provides that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" Id. at 246-47 (quoting Fed. R. Civ. P. 9(b)).

"It is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract." EQT Infrastructure Ltd. v. Smith, 861 F. Supp. 2d 220, 233 (S.D.N.Y. 2012) (citations omitted); see also Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir.1996) (requiring that a fraud claim raised in a case stemming from a breach of contract be "sufficiently distinct from the breach of contract claim") (citation omitted).

In Bridgestone/Firestone, the Second Circuit identified three situations in which a plaintiff may bring a fraud action after a defendant makes "intentionally-false statements . . . indicating [an] intent to perform under the contract." 98 F.3d at 19-20. A "plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent

9

misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Id. (internal citations omitted).

With respect to collateral or extraneous fraudulent misrepresentations, "New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 184 (2d Cir. 2007) (citations omitted); Crabtree v. Tristar Auto. Grp., Inc., 776 F. Supp. 155, 163 (S.D.N.Y. 1991) (explaining that generally, a "representation that performance will be made, even if only implied through the negotiation process, is not distinct from the contract," but that there is an exception "if the promise made was a representation of present fact, not future intent") (citations omitted).

Put another way, "[a] plaintiff sufficiently states a claim upon which relief may be granted only when it alleges fraud that is extraneous to the contract, rather than merely fraudulent non-performance of the contract itself." Todi Exports v. Amrav Sportswear, Inc., No. 95 Civ. 6701, 1997 WL 61063, at *2 (S.D.N.Y. Feb.13, 1997) (citation omitted). "Where courts have found viable fraud claims based on fraudulent misrepresentation, the statements concerned matters separate and distinct from the subject matter of the contract." MCI World Commc'ns, Inc. v. North Am. Commc'ns Control, Inc., No. 98 Civ. 6818, 2003 WL 21279446, at *9 (S.D.N.Y. June 4, 2003) (discussing various cases and dismissing plaintiff's

10

fraudulent misrepresentation claim because "[t]he misrepresentations . . . are closely related to the subject matter of the contract and concern representations of future intent, not a separate, present fact").

## IV. LEGAL PRINCIPLES

Only plaintiff's breach of contract claim (and only a portion thereof) survives scrutiny. As to his fraudulent inducement and Texas Securities Act claims, the terms of the SPA are so clear that while plaintiff Townsley may be disappointed, he never had a basis for bringing these claims.

### A. The Contract Claim

Plaintiff asserts that defendant breached the Earn-Out provision (contained in section 1.5) and the indemnification provision (contained in subparagraph 7.2(b)(ii)). With regard to the former, plaintiff asserts that defendant improperly "shifted" revenue and expenses and took actions in bad faith in order to avoid triggering the Earn-Out Payment.

As an initial matter, the terms of section 1.5 relating to the Earn-Out Payment are clear and unambiguous. The "shift[ing]" of revenues or expenses to which subparagraph (d)(i) refers prohibits shifting MCD revenues or expenses to or from an affiliate company, and also prohibits the shifting of MCD revenues or expenses from one time period into another. Subparagraph (ii) refers to gamesmanship with regard to overhead expense allocation. And finally, subparagraph (iii) concerns any such actions prohibited by the prior subparagraphs

or generally, taken in bad faith and "with the intent and effect" of avoiding or reducing the Earn-Out Payment.

As set forth in paragraph 80 of the SAC, plaintiff's factual assertions supporting breaches of subparagraphs 1.5(d)(i) and (ii) concern Airxcel's (1) acquisition of MCD's competitor, United Shade, (2) terminating MCD's commissioned sales force, (3) requiring MCD to disclose to its affiliate, United Shade, certain proprietary information, (4) failing to provide MCD with appropriate engineering support, and (5) requiring MCD's sole remaining salesperson to perform marketing work for United Shade. As to the first four, it is plain that none of these factual allegations concerns a "shift" in actual MCD revenue or expenses between MCD and an affiliate or from one time period to another, as contemplated by (i); it is also plain that none concerns allocation of overhead expenses. As to the fifth, even if the Court were to decide that this conduct shifted an expense from United to MCD, plaintiff has not alleged (nor could he) that this shift was alone responsible for MCD's failure to meet the Earn-Out target.

The sole remaining question is whether there is a sufficient, non-conclusory basis in the SAC to suggest that defendants took actions in bad faith with the intent and effect of avoiding or reducing the Earn-Out. This is a more complicated question.

Notably, subparagraph (iii) is broader than subparagraphs (i) and (ii). It prohibits defendant from taking <u>any</u> actions – whether it be the revenue shifting in (i) or the expense allocation in (ii), or otherwise – with the intent and effect of

avoiding or reducing the Earn-Out. Defendant asserts that this subparagraph is limited to the actions described in (i) or (ii), but that is incorrect. The provision is written broadly to both enumerate specific actions in those subparagraphs, but to include "any actions" taken in bad faith. This expansive language allows the claim to survive.

There is a triable issue of fact that this Court cannot resolve at this stage, as to whether the actions about which plaintiff complains, both in his pleading as well as in his declaration (ECF No. 57), were taken with the intent <u>and</u> effect to impact the Earn-Out Payment. Defendant argues that in all events, none of the alleged actions could have had the effect of avoiding or reducing the Payment. As support, it proffers the revenues obtained from all sales – whether the sales of United Shade or MCD – eliminate a triable issue. If this argument were being made at the conclusion of full discovery, the Court would agree with defendant. But it is not. This is an early motion for summary judgment, one that can narrow the case, but not eliminate it. Plaintiff's argument that he requires discovery in order to investigate these facts carries the day. It may well be that an investigation into defendant's financials will put this issue to rest. If so, the Court is confident that defendant will renew this argument at the appropriate time.

Finally, the outcome of plaintiff's indemnification claims follows the Court's rulings above. Subsection 7.2(b) provides that as "Purchaser", the defendant agrees to indemnify plaintiff as one of the "Selling Shareholders" against losses "based upon, attributable to or resulting from" (ii) the "breach of any covenant or other

13

agreement on the part of Purchaser under this Agreement." This language sweeps in the commitments in Section 1.5. Accordingly, to the extent that plaintiff is able to pursue his claim as to subparagraph 1.5(d)(iii), he has a potential claim under subsection 7.2(b) for any interest and attorneys' fees as well.

B. <u>Fraudulent Inducement</u>

In contrast to the two portions of his contract claim that remains live, plaintiff's fraudulent inducement claim fails entirely. The SAC and record on this motion recite the very same conduct in support of plaintiff's contract and fraudulent inducement claim. In sum, that before the deal was inked, defendant promised that it would run MCD's operations in a particular manner: that it would hire new sales people, not lay certain of them off, supply engineering assistance to expand the product line and allow MCD to use a discounted freight network. None of these promises were included in any of the reps and warranties to which the parties agreed. There are several reasons why this conduct cannot form the basis of a fraudulent inducement claim.

As a factual matter, when the parties executed the SPA, they chose to include several provisions designed to eliminate later asserted reliance on extra-contractual promises. In this regard, they included a "Non-Reliance" section in which the Selling Shareholders, including plaintiff, have "not relied upon the accuracy or completeness of any express or implied representation, statement or information of any nature, made or provided by or on behalf of Purchaser," except for those included in Article V of the SPA. (§ 4.31.) While it is true that that provision

14

continues and does not apply to claims of fraud or intentional breach of contract, it is plain that the intention of this provision is to limit the effect of pre-closing statements to the specific reps and warranties included in the SPA. Finally, the parties agreed to include a broad merger integration provision. In section 8.5, plaintiff agreed that the SPA represented the entire agreement between the Parties with respect to the subject matter thereof. (ECF No. 47-1, § 8.5.)

This factual record is supplemented by a legal recognition that a plaintiff fails to state a claim when its allegations of fraud are no more than "merely fraudulent non-performance of the contract itself." Todi Exports, No. 95 Civ. 6701, 1997 WL 61063, at *2. "Where courts have found viable fraud claims based on fraudulent misrepresentation, the statements concerned matters separate and distinct from the subject matter of the contract." MCI World Commc'ns, Inc., No. 98 Civ. 6818, 2003 WL 21279446, at *9 (discussing various cases and dismissing plaintiff's fraudulent misrepresentation claim because "[t]he misrepresentations . . . are closely related to the subject matter of the contract and concern representations of future intent, not a separate, present fact"). Thus, plaintiff's reliance on alleged pre-execution promises as the basis for his fraud claim cannot withstand scrutiny.

Defendant argues that the same contractual provisions that preclude the fraud claim also preclude the contract claim. This is incorrect. The particular language in subsection 1.5(d) allows for a contract claim where, as alleged here, certain post-execution conduct is taken with the intent and effect of avoiding or reducing the Earn-Out Payment. The inclusion of this language thus allows

15

plaintiff to assert that post-closing conduct (such as the elimination of sales positions, failure to provide engineering support and the like), were undertaken with such purpose in mind, and had the negative effect that is contractually prohibited. Thus, the breach of contract claim in this regard proceeds because of different contractual language than that precluding the fraud claim.

    C.    <u>The Texas Securities Act</u>

In light of the New York choice of law provision, plaintiff's claim under the Texas Securities Act ("TSA") fails. As part of the SPA, the parties agreed that the subject matter of the contract would be governed by New York law. The TSA is a claim brought under Texas law; New York law does not include the TSA.

However, this claim also fails for the same reason the fraud claim fails: it is precluded by various contractual provisions. The TSA claim is based on an alleged failure by defendant to keep certain promises made prior to signing the SPA. But section 4.31 contains an explicit disclaimer of reliance on such promises and the merger integration clause in section 8.5 similarly prevents general use of extra-contractual promises to support a claim.

V.    PLAINTIFF'S MOTION PURSUANT TO RULE 56(d)

In opposition to this motion, plaintiff has brought a motion pursuant to Federal Rule of Civil Procedure 56(d) for discovery. That motion is denied with regard to both the fraud claim and the TSA claim. Discovery will not cure the issues upon which this Court's decision to dismiss those claims relies. Similarly, as

the subparagraphs 1.5(d)(i) and (ii) claims are almost entirely based on a misreading of the contract, discovery will not assist with regard to them.

VI. CONCLUSION

For the reasons set forth above, defendant's motion is GRANTED in part and DENIED in part. The only claims that survive are the breach of subparagraph 1.5(d)(iii) and the related indemnification claim under subsection 7.2(b).

The Clerk of Court is directed to terminate the motion at ECF Nos. 45 and 51. The parties shall appear before the Court for a pretrial conference on **October 15, 2018,** at **11:00 a.m.** The parties are also directed to meet and confer and submit a proposed scheduling Order to the Court **not later than one week before the conference**.

SO ORDERED.

Dated:   New York, New York
         August 15, 2018

                                            _____
                                            KATHERINE B. FORREST
                                            United States District Judge

17